## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DIXIE PELLETS, LLC,** | ) | **Case No. 09-05411-11-TOM** |
| | ) | **Chapter 11 Proceeding** |
| Debtor. | ) | |

### DEBTOR'S MOTION FOR INTERIM ORDER AND FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2) AND BANKRUPTCY RULE 4001(b)

Dixie Pellets, LLC, debtor and debtor-in-possession (the "Debtor"), hereby moves the Court, pursuant to 11 U.S.C. §§ 361 and 363 and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for interim and final approval of the Debtor's use of cash collateral, as follows:

### BACKGROUND

A.   **Procedural Posture.**

1.     On September 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2.     The Debtor is operating its business and managing its financial affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, committee, or examiner has been appointed in the Debtor's case.

B.      **Corporate Structure and Nature of Business Operations.**

3.      The Debtor is a limited liability company organized and existing under the laws of the state of Alabama with its principal place of business in Birmingham, Alabama. Approximately 86% of the Debtor's membership units are owned by Harbert DP, LLC ("Harbert DP"), a wholly owned subsidiary of Harbert Power Fund III, LLC ("HPF III"). The remaining membership units are owned by various individual and corporate investors.

4.      The Debtor was formed in 2006. The Debtor owns and operates a biomass production facility in Selma, Alabama (the "Plant"). The Plant is located on a 38-acre parcel situated on the Alabama River. The Debtor controls the site under a long-term lease agreement with the Alabama State Port Authority. Construction of the Plant commenced in February 2007 and was substantially completed in September 2008. Production at the Plant commenced in January 2008.

5.      At the Plant, the Debtor converts sawdust, shavings, wood chips, and other biomass into compressed wood pellets. The Debtor's customers are primarily European utilities which purchase the biomass pellets as substitutes for fossil fuels as encouraged by country-specific subsidies. After manufacture, the Debtor transports the pellets to a terminal near Mobile, Alabama, for export to the Debtor's European customers. The pellets are transported through the use of towboats pushing barges along the Alabama and Mobile Rivers. The Debtor contracts for towing services with various third parties, and leases approximately 24 barges in additional to the Debtor's own fleet of 10 barges. The pellets are then shipped from the terminal to the Debtor's overseas customers.

6.      Earlier this month, the Debtor ceased manufacturing operations at the Plant due to an unexpected working capital shortfall. The Debtor's financial crisis was precipitated by the failure and refusal of one of the Debtor's main customers, Essent Energy Trading BV ("Essent"), to pay the Debtor an account receivable of approximately $3 million. Despite accepting shipment from the Debtor, Essent asserted that the Debtor was in breach of its supply agreement with Essent, thereby relieving Essent of its obligations to pay for such shipment. Essent has initiated arbitration proceedings against the Debtor in London for alleged breach of the supply agreement. The Debtor denies Essent's allegations and contends that Essent is the breaching party under the agreement.

7.      Prior to the shutdown of operations in early September, the Debtor employed approximately 72 employees. The Debtor currently employs approximately 15 workers to assist in the maintenance and security of the Plant and the winddown of the Debtor's operations.

**D.      Financial Performance.**

8.      The Debtor has yet to achieve the financial performance it anticipated when the Plant commenced production in January 2008. Several factors have impeded its operations. The downturn in the U.S. housing market has adversely affected the supply of dry wood raw materials to the Plant. The sawdust, shavings, and other raw materials used in the making of the Debtor's wood pellets are largely derived from the production of wood products for use in the home construction business. As new home construction has decreased, the supply of dry wood raw materials likewise has decreased since operations started at the Plant and has been significantly less than the Debtor's business plan projected. The Debtor has also experienced problems with certain equipment at the Plant that have frustrated the Debtor's efforts to operate the Plant at it full production capacity.

9.     These unexpected challenges, coupled with the significant start-up costs associated with any new manufacturing facility, have impaired the Debtor's financial performance to date.  During the 12-month period ending on July 30, 2009, the Debtor had gross revenues of approximately $11.4 million.  The Debtor's expenses during such period were substantially greater, resulting in a net loss from operations during such period of over $14 million.

**E.     Debt and Lien Structure.**

10.     The Debtor owes over $67.2 million in secured indebtedness.  Pursuant to a Loan Agreement dated May 12, 2008, (the "Loan Agreement") by and among the Debtor, Calyon New York Branch as Administrative Agent (the "Administrative Agent"), and the lenders party thereto from time to time (the "Lenders"), the Debtor obtained project financing for the Plant in the principal amount of $70 million (the "Loan").  The Loan is secured by a first priority lien on the Plant and substantially all of the Debtor's other assets, pursuant to, among other documents, (a) a Collateral Agency and Intercreditor Agreement, dated May 12, 2008, (the "Collateral Agreement") among the Administrative Agent, Calyon London Branch as Currency Hedge Provider, the Bank of New York Trust Company, N.A. as Collateral Agent (the "Collateral Agent"), Calyon New York Branch as Construction Agent (the "Construction Agent" and, together with the Collateral Agent and the Administrative Agent, the "Agents") and the Debtor, (b) a Depositary and Account Control Agreement, dated as of May 12, 2008, (the "Account Control Agreement") among the Debtor, the Collateral Agent and the Bank of New York Trust Company, N.A. as Depositary Bank, and (c) the Assignment and Security Agreement, dated as of May 12, 2008 by the Debtor to the Collateral Agent (the "Security Agreement").[1]  All assets and properties of the Debtor as to which liens and security

---

[1] In addition to the Collateral, the Loan is also secured by a $30 million letter of credit issued by Regions Bank for the account of Harbert DP LLC.

interests were granted under or in connection with the Loan Agreement, the Collateral Agreement, the Account Control Agreement, the Security Agreement are hereinafter referred to as the "Collateral".

11.    The Collateral includes the cash proceeds derived from the September 4, 2009 termination of the ISDA Master Agreement dated as of May 12, 2008 between Calyon London Branch and the Debtor (together with associated schedules, the "Currency Hedge Agreement"). The Debtor entered into the Currency Hedge Agreement in connection with the Loan and pledged its interests therein as security for the Loan.   Upon the termination of the Currency Hedge Agreement, the sum of $8,271,051.00 was paid by Calyon to the Debtor, and such amounts were deposited in the Revenue Account established pursuant to the Account Control Agreement. Such funds constitute "cash collateral" as such term is defined in 11 U.S.C. § 363.

12.    Pursuant to the Account Control Agreement, a debt service reserve account (the "Debt Service Reserve Account") was established for the benefit of the Collateral Agent.  The Account Control Agreement provides that the Debt Service Reserve Account is under the sole dominion and control of the Collateral Agent, and that the Debtor has no right of withdrawal with respect to such account. As of the Petition Date, there was not less than $734,443.65 on deposit in the Debt Service Reserve Account.

13.    Pursuant to an Assignment and Security Agreement dated May 12, 2008, Essent claims a subordinate security interest in the Debtor's inventory, equipment, contract rights, and vessels, among other things, as security for the Debtor's obligations to Essent under their supply agreement. Essent's lien does not extend to the Debtor's accounts receivable, cash, instruments, or

intangibles, among other things. The Debtor disputes any liability to Essent under its supply agreement.

## SUMMARY OF RELIEF REQUESTED

14.    The Collateral Agent, for the benefit of the Lenders, claims a lien and security interest in all of the Collateral, including cash, proceeds and other cash equivalents that constitute cash collateral under Section 363(a) of the Bankruptcy Code.

15.    The Debtor must use cash collateral to pay wages, utilities, and other expenses related to business operations and the administration of the Debtor's estate. The Debtor seeks authority to use cash collateral and provide adequate protection under Section 363(c) of the Bankruptcy Code.

## JURISDICTION AND NOTICE

16.    The Debtor brings the instant motion (the "Motion") pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

17.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334(b). The Motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of the Debtor's case and the Motion is proper before the Court under 28 U.S.C. §§ 1408 and 1409.

18.    No committees have been appointed in the Debtor's case. The Debtor has served a copy of the Motion on the Bankruptcy Administrator, and counsel for the twenty largest

unsecured claims in the Debtor's case, and all parties requesting notice (collectively, the "Service Group").

19.    Under Bankruptcy Rule 4001(b)(2), the Court may commence a final hearing on a motion to approve use of cash collateral no earlier than fifteen (15) days after service of the motion and notice of hearing on the motion.  Bankruptcy Rule 4001(b)(2) further provides, however, that the Court may conduct a preliminary hearing before the expiration of the 15-day notice period as necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  The Debtor requests the Court conduct a preliminary hearing on the Motion on an expedited basis to authorize the use of cash collateral as necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing.

## NEED FOR USE OF CASH COLLATERAL

20.    To the extent the Collateral consists of cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, the Collateral is cash collateral under Section 363(a) of the Bankruptcy Code (the "Cash Collateral").

21.    To preserve the value of the Debtor's assets and the Debtor's ability to manage its estate for the benefit of creditors and other parties in interest, the Debtor must use the Cash Collateral to pay wages, utilities, and other expenses related to its operations and the administration of the Debtor's estate.  Without authority to use the Cash Collateral, the Debtor will not be able to retain its remaining employees or to preserve the value of its assets for the benefit of the Debtor's estate.

22.     The Debtor proposes to use Cash Collateral on the terms of the proposed order attached hereto as <u>Exhibit A</u> and incorporated by reference herein (the "Proposed Order").    The Debtor seeks authorization to use Cash Collateral in accordance with the interim budget attached hereto as <u>Exhibit B</u> (the "Interim Budget").    At or prior to the final hearing on this Motion, the Debtor will file with the Court a final cash collateral budget under which it will propose to use Cash Collateral (the "Final Budget").

## AUTHORIZATION TO USE CASH COLLATERAL

23.     Under Section 363(c)(2) of the Bankruptcy Code, the Debtor may not use the Cash Collateral unless the Collateral Agent consents or the Court authorizes the use of the Cash Collateral and provides adequate protection of the Collateral Agent's interests in the Cash Collateral.

24.     Upon information and belief, the Collateral Agent, the Required Lenders, and the Administrative Agent consent to the Debtor's use of the Cash Collateral on the terms set forth in this Motion and the Proposed Order.

25.     To preserve the value of the Debtor's assets and the Debtor's ability to manage its estate for the benefit of creditors and other parties in interest, the Debtor must use the Cash Collateral to pay employees, utilities and other expenses related to its operations and the administration of the Debtor's estate.    The Debtor respectfully submits that its use of Cash Collateral for these purposes is due to be approved.

26.     The Debtor requests the Court authorize on a preliminary basis the Debtor's use of the Cash Collateral to the extent necessary to avoid immediate and irreparable harm.    The

Debtor has an immediate need for authorization to pay pre-petition payroll obligations and other necessary operating expenses. The Interim Budget reflects the Debtor's minimum cash flow needs to avoid immediate and irreparable harm.

27.    As more fully set forth in the Proposed Order attached hereto, the Debtor proposes that the Collateral Agent, for the benefit of the Lenders, be granted additional adequate protection in the form of replacement liens upon the Debtor's post-petition accounts, inventory and all proceeds thereof, *provided, however,* that such post-petition accounts, inventory and proceeds only secure the Debtor's outstanding obligations under the Loan to the extent of the amount by which the Debtor's use of Collateral, including Cash Collateral, causes a diminution in the value of the Collateral. The Debtor proposes that such replacement liens be deemed perfected without any further action by the Collateral Agent, effective *nunc pro tunc* as of the Petition Date. As additional adequate protection, the Debtor proposes to pay reasonable fees and disbursements (whether prepetition or postpetition) of counsel to the Administrative Agent and the Collateral Agent out of the Cash Collateral. Finally, the Debtor proposes that the funds on deposit in the Debt Service Reserve Account be immediately applied withdrawn and applied against the Secured Obligations, thereby reducing the indebtedness and the interest accrual on such debt during the course of the Debtor's bankruptcy case.

## CONCLUSION

28.    Approval on an interim basis of the use of the Cash Collateral to pay the expenses set forth in the Interim Budget is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing. Final approval of the use of Cash Collateral according to the

Final Budget upon final hearing is necessary to preserve the Debtor's ability to avail itself of the

protections of chapter 11 and to preserve the value of its estate for creditors.

29.    The adequate protection proposed by the Debtor is fair and reasonable and

protects the Collateral Agent's and the Lenders' interests in the Collateral while allowing the Debtor

to fund its activities by using the Cash Collateral.  Authorizing the Debtor to use the Cash Collateral

and provide adequate protection as set forth herein is warranted under Sections 361 and 363 of the

Bankruptcy Code and is in the best interests of the Debtor, its estate and creditors, and all parties in

interest.

**WHEREFORE, PREMISES CONSIDERED,** the Debtor respectfully requests the

Court to:

(a)    Set the Motion for emergency interim hearing to consider the Debtor's use of
Cash Collateral to pay the Debtor's expenses set forth in the Interim Budget;

(b)    Upon such interim hearing, enter an order in substantially the same form as
the Proposed Order authorizing the Debtor to use the Cash Collateral;

(c)    Set the Motion for final hearing at the earliest practicable date after fifteen
(15) days from service of the Motion;

(d)    Upon such final hearing, enter a final order granting the Motion approving
the use of Cash Collateral on a final basis on the terms and conditions set
forth herein and in the Final Budget; and

(e)    Grant such other, further, or different relief as may be just and proper.

Respectfully submitted this 14th day of September, 2009.

**Proposed Counsel for the Debtor**

/s/ Jay Bender

Jay Bender
Chris Hawkins
Jennifer Henderson
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104
Telephone: (205) 521-8000
Facsimile:  (205) 521-8500
jbender@babc.com
chawkins@babc.com
jhenderson@babc.com